Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/01/2016 09:06 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
CHRISTOPHER A. EDWARDS, APPELLANT.
___ N.W.2d ___

Filed July 1, 2016.    No. S-15-139.

1. **Pleadings: Appeal and Error.** An appellate court reviews a refusal to grant leave to amend for abuse of discretion.
2. **Postconviction: Proof: Appeal and Error.** A defendant requesting postconviction relief must establish the basis for such relief, and the factual findings of the district court will not be disturbed unless they are clearly erroneous.
3. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.
4. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
5. **Criminal Law: Words and Phrases.** Modus operandi is a characteristic method employed by a defendant in the performance of repeated criminal acts, and means, literally, "method of working," and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Brian Munnelly and Jerry L. Soucie for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, and Stacy, JJ.

Wright, J.

## I. NATURE OF CASE

In March 2007, a jury convicted Christopher A. Edwards of the crimes of second degree murder and use of a deadly weapon to commit a felony in connection with the disappearance of Jessica O'Grady. In this appeal, Edwards maintains that some of the evidence presented against him at trial was fabricated by David Kofoed, a former supervisor of the Douglas County Crime Scene Investigation Division (CSI) who was discovered to have fabricated and planted evidence in two different murder cases.[1] Edwards also contends that his former attorney, Steven Lefler, acted under a conflict of interest during his trial and during the pendency of his direct appeal.

## II. BACKGROUND

This is Edwards' third appeal to this court. We affirmed Edwards' convictions on direct appeal in *State v. Edwards* (*Edwards I*).[2] Edwards then filed a motion for postconviction relief, which the district court denied without an evidentiary hearing. In his second appeal in *State v. Edwards* (*Edwards II*),[3] we affirmed the district court's order on all but two of Edwards' claims. With respect to those claims, we remanded the cause for an evidentiary hearing on two issues:

---

[1] See, *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015); *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012). See, also, *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

[2] *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009).

[3] *State v. Edwards, supra* note 1.

(1) whether Edwards was denied due process by the State's knowing use of fabricated evidence to obtain his convictions and (2) whether Edwards' trial counsel labored under an actual conflict of interest. After the remand but before the evidentiary hearing, Edwards filed in this case a "Motion for Leave to File Second Verified Motion for Postconviction Relief," which motion the district court denied. An evidentiary hearing was held, and the district court denied Edwards' motion for postconviction relief. Edwards appeals for a third time, challenging the district court's refusal to grant leave to amend his original motion for postconviction relief and the district court's denial of postconviction relief.

## 1. *Edwards I*

In June 2006, Edwards was charged by information with the crimes of second degree murder and use of a deadly weapon to commit a felony in connection with the disappearance of O'Grady. O'Grady was last seen on May 10, 2006, leaving her apartment on her way to Edwards' residence.

Omaha police interviewed Edwards and obtained permission to search his bedroom at his aunt's house. A short sword was found in the closet, and blood was found on the sword. Other evidence found in Edwards' bedroom was set forth in *Edwards I* as follows:

> Spattered blood was found on the nightstand, headboard, clock radio, and ceiling above the bed. Edwards was asked to explain the bloodstains on the headboard and clock, and replied that "he had cut his wrist." A small bloodstain was located on the top of the mattress. Edwards was asked about the bloodstain and replied that "he had intercourse with a girlfriend who was menstruating." But on further investigation, a very large, damp bloodstain was found on the underside of the mattress, covering most of the bottom side of the mattress. Bloodstains were later found on the bedding, a chair in the room, a bookcase, and laundry baskets. Luminol, a chemical used to locate where blood has been cleaned up, was applied to the

walls of the room. The Luminol suggested blood on large areas of the south and west walls. Stains that appeared to be blood were found on the ceiling, covered up by white paint.[4]

A search of Edwards' car and the garage was also conducted: A shovel and a pair of garden shears were found in Edwards' vehicle. A bloodstain was found on the handle of the garden shears. More bloodstains were found on the trunk gasket of the car and on the underside of the trunk lid. A black, plastic trash bag was found in the garage next to the vehicle. The bag contained two bloodstained towels and a receipt from a drugstore in west Omaha. Edwards had been videotaped purchasing poster paint, white shoe polish, and correction fluid at that drugstore on May 11, 2006, at 7:41 p.m. The poster paint was chemically identical to that found on Edwards' ceiling.[5]

The DNA profiles recovered from the blood on the above items were all consistent with O'Grady's DNA profile. The chances of another unrelated Caucasian person having the same DNA profile as the DNA profile recovered from those items differed depending on the item, but the chances ranged from 1 in 15.6 billion to 1 in 26.6 quintillion.[6]

Edwards was convicted of both crimes for which he was charged, and he appealed both convictions, arguing, among other things, that the evidence was insufficient to prove that O'Grady had been murdered, because her body had not been found. We affirmed Edwards' convictions in *Edwards I*.

## 2. *Edwards II*

In July 2010, Edwards filed a motion for postconviction relief. We summarized the claims set forth in that motion in *Edwards II*:

---

[4] *Edwards I, supra* note 2, 278 Neb. at 62, 767 N.W.2d at 793-94.

[5] *Id.* at 62-63, 767 N.W.2d at 794.

[6] *Id.*

Edwards claimed that the State violated his due process rights by presenting fabricated evidence during his trial. Edwards alleged that while investigating O'Grady's murder, . . . Kofoed, a supervisor of [CSI], planted blood evidence to be used against Edwards. Edwards' allegations and attachments set out a history of Kofoed's unlawful conduct during other murder investigations. Edwards alleged that the State's introduction of forensic evidence at his trial that had been falsified by law enforcement officials constituted outrageous government conduct that violated his right to due process.

In addition to his due process claim, Edwards alleged claims of ineffective assistance of counsel. Edwards was represented by the same three attorneys at trial and on appeal. First, he alleged that although his lead attorney, . . . Lefler, should have known that Kofoed was suspected of planting evidence during the 2006 murder investigation, Lefler did not investigate this information or effectively impeach Kofoed at trial. Edwards alleged that Lefler was ineffective because he was a friend of Kofoed.

Edwards also claimed that his trial counsel was ineffective in failing to retain a DNA expert to testify at trial. He alleged that an expert could have testified that the blood on his mattress came from two contributors—neither of which was Edwards. He claimed that such testimony would have supported his theory that O'Grady had experienced a miscarriage, which would have explained the blood on his mattress. He also claimed that his counsel should have obtained additional DNA testing after learning that mixed DNA samples had been found. He alleged that this evidence could have opened the door to other possible theories about the blood on the mattress. Finally, Edwards alleged that his trial counsel failed to effectively investigate (1) calls made to O'Grady's aunt after O'Grady's disappearance, concerning the

location of O'Grady's car; (2) whether O'Grady had contacted an online travel agency around the time of her disappearance; and (3) whether an "'alternate suspect'" existed.

Regarding his direct appeal, Edwards alleged that his appellate counsel was ineffective in failing to raise (1) the trial court's denial of his motion to change venue, (2) the due process violation related to his claim of falsified evidence, and (3) his other claims of his trial counsel's ineffective assistance.[7]

In August 2011, the district court sustained the State's motion to dismiss Edwards' motion for postconviction relief without an evidentiary hearing. Edwards appealed.

In September 2012, in *Edwards II*, we concluded that only two issues raised in Edwards' motion for postconviction relief warranted an evidentiary hearing: (1) whether Edwards was denied due process by the State's knowing use of fabricated evidence to obtain his convictions and (2) whether Edwards' trial counsel labored under an actual conflict of interest. As to Edwards' other claims, we determined that the district court properly denied Edwards postconviction relief.

### 3. Edwards' Motion for
### Leave to Amend

After the remand in *Edwards II*, but before the evidentiary hearing on the two claims described above, Edwards filed in this case his motion for leave to file a second motion for postconviction relief. In support of his motion, Edwards attached a document titled "Second Verified Motion for Postconviction Relief." That document set forth five claims: (1) Edwards' due process rights were violated because his convictions were based on fabricated evidence; (2) Edwards' due process rights were violated because the State failed to disclose material exculpatory evidence; (3) Edwards' attorney did not provide

---

[7] *Edwards II, supra* note 1, 284 Neb. at 387-88, 821 N.W.2d at 689-90.

conflict-free representation, as required by the 6th and 14th Amendments to the U.S. Constitution; (4) the step instruction on the lesser-included offense of manslaughter failed to distinguish between the intent to kill associated with second degree murder and the intent to kill resulting from a "sudden quarrel"; and (5) cumulative error deprived Edwards of his right to substantive due process under the 14th Amendment.

The district court implicitly construed Edwards' motion for leave to file a second motion as a motion for leave to *amend* his original postconviction motion. The court overruled the motion to amend, reasoning that it was without power to affect the rights and duties outside the scope of this court's remand in *Edwards II*. Edwards accepts the court's characterization of his motion (as a motion to amend) but appeals the court's decision overruling the motion, arguing that he should have been allowed to amend. Because both Edwards and the district court treat Edwards' motion as a motion to amend, and because Edwards filed the motion for leave to file a second motion under the same docket number as the original postconviction motion, we will also treat Edwards' motion as a motion to amend.

## 4. EVIDENTIARY HEARING
### ON REMAND

The evidentiary hearing took place on July 8 and August 14, 2013, and March 13, 14, and April 9, 2014. Below, we set forth the evidence presented at the hearing as it relates to the issues the district court was to address on remand, i.e., (1) whether Edwards was denied due process by the State's knowing use of fabricated evidence to obtain his convictions and (2) whether Edwards' trial counsel labored under an actual conflict of interest. The evidence on these two issues includes not only the testimony presented at the evidentiary hearing, but also deposition testimony and testimony presented at Edwards' original trial, as well as exhibits from both the trial and the postconviction proceedings.

### (a) Fabrication of Evidence

For the State to knowingly use fabricated evidence, it is axiomatic that there must first be fabricated evidence. Therefore, before considering any evidence that the State knowingly used fabricated evidence, we first consider the facts relevant to Edwards' claim that Kofoed fabricated evidence against him.

One of Edwards' arguments is that the similarities between the O'Grady investigation and the investigations in which Kofoed was found to have fabricated evidence show that Kofoed fabricated evidence in the O'Grady investigation. Accordingly, we review the facts of those investigations in which Kofoed was found to have fabricated evidence, specifically, the investigation into the murders of Wayne and Sharmon Stock and the investigation into the disappearance and presumed murder of a 4-year-old child.[8] We then review the evidence surrounding the investigation in this case.

### (i) Investigation Into Stocks' Murders

In April 2006, the Stocks were found murdered in their rural home outside Murdock, Nebraska. CSI processed the crime scene. After witnesses reported a tan sedan parked 1 mile from the Stocks' home within hours of the murder, law enforcement followed up on any family member, friend, or associate of the Stocks who might have owned a similar vehicle. Family members identified William Sampson, Sharmon Stock's nephew, as a person owning a tan Ford vehicle.

After a thorough search of Sampson's vehicle, investigators failed to find any evidence of blood or other forensic evidence. The vehicle was moved to CSI's impound lot.

One week after the murders, law enforcement obtained a false confession from another family member, Matthew Livers. After over 10 hours of questioning, Livers claimed that he committed the murders, that he used Sampson's vehicle, and

---

[8] *State v. Kofoed, supra* note 1.

that his cousin was also involved. Livers recanted his statement the next day.

After Kofoed learned of Livers' confession, Kofoed and another investigator, Clelland Retelsdorf, reexamined Sampson's vehicle. While Retelsdorf was searching the back seat, Kofoed claimed to have collected a positive presumptive test for blood from the front area of the vehicle. Retelsdorf then attempted to collect four or five samples with a cotton swab in that area, but the results were negative for blood. Retelsdorf and Kofoed decided that each would write a report stating what he did, not what the other investigator did. Retelsdorf completed his report that day; it did not reflect that Kofoed was present during the search. Kofoed's report was not completed until 11 days after the search. Kofoed's report reflected that Kofoed had obtained a filter paper swab on the day the report was filled out, rather than 11 days prior; it did not reflect that Retelsdorf swabbed the same area with negative results.

Kofoed's filter paper swab was taken to the University of Nebraska Medical Center's DNA laboratory (UNMC), and the blood was matched to the DNA profile of Wayne Stock. This evidence corroborated Livers' false confession. One month later, Livers and his cousin were exonerated; a couple from Wisconsin confessed to murdering the Stocks.[9] The charges against Livers and his cousin were eventually dismissed.

In 2010, Kofoed was convicted of tampering with evidence during the Stocks' investigation.[10] At the time of Wayne Stock's autopsy, CSI had taken possession of a bloody shirt worn at the time of the murder. It was placed in a bag, sealed, and stored in CSI's biohazard room. The Federal Bureau of Investigation (FBI) later found that the bag containing the shirt had been unsealed, then resealed with Kofoed's initials on the tape.

---

[9] See *State v. Fester*, 274 Neb. 786, 743 N.W.2d 380 (2008), and *State v. Reid*, 274 Neb. 780, 743 N.W.2d 370 (2008).

[10] See *State v. Kofoed, supra* note 1.

### (ii) Investigation Into Disappearance
### and Presumed Murder of
### Brendan Gonzalez

Four-year-old Brendan Gonzalez (Brendan) was reported missing in January 2003. As part of the investigation, CSI was called to process a suspected crime scene—the garage of Brendan's home. Kofoed and Retelsdorf went to the scene. They found several droplets of blood on the floor of the garage and on Brendan's bike and a recliner rocker located in the garage. Most, but not all, of the items suspected of containing biological evidence were submitted to UNMC. The items submitted for DNA testing showed that the blood on several of the items were consistent with the DNA profile of Brendan. Other samples were mixed.

Despite an extensive search, law enforcement officers were unable to locate Brendan's body. But on June 2, 2003, Brendan's father confessed that he killed Brendan and disposed of the body in a Dumpster in Bellevue, Nebraska. Kofoed and Retelsdorf then searched the Dumpster. They collected swabs from the Dumpster and reported a positive presumptive test for blood. They also collected some debris from the Dumpster.

On June 5, 2003, Kofoed filled out a property report listing the items that he and Retelsdorf had collected from the Dumpster. The report reflected that Kofoed had swabbed one of the items with filter paper. All of the items, except the item Kofoed swabbed, were submitted for DNA testing. However, those items were never tested for DNA, because the preliminary screening tests at UNMC were all negative for blood. But Kofoed's filter paper swab and the cotton swabs collected from the Dumpster were tested. The cotton swabs from the Dumpster were badly degraded, with barely reportable alleles. However, Kofoed's filter paper swabs produced a complete DNA profile without any evidence of degradation or contamination. The results were consistent with Brendan's DNA profile, corroborating his father's confession.

The FBI later suspected Kofoed of fabricating evidence in that case. In the FBI's own laboratory, it tested the item that Kofoed claimed to have swabbed and never submitted for DNA testing. It also sent the item to a private laboratory. No analyst from either laboratory found any DNA material. At Kofoed's criminal trial, experts testified that it was practically impossible to have collected Brendan's complete DNA profile from the Dumpster under the environmental factors that were present, i.e., exposure to heat and humidity for 21 weeks (approximately 5 months).

The issue of whether Kofoed planted evidence in Brendan's murder investigation was the subject of an extensive rule 404[11] hearing in *State v. Kofoed*.[12] The district court found that the State had proved by clear and convincing evidence that Kofoed had fabricated evidence in that investigation. We affirmed that finding in *Kofoed*.

### (iii) O'Grady Investigation

We turn now to the O'Grady investigation. Because Edwards claims that Kofoed fabricated blood evidence on the shovel, garden shears, trunk gasket, and trunk roof, all of which were located in Edwards' car, we focus on the search of Edwards' car. Edwards also claims that the blood evidence on the sword was fabricated, so we review the discovery and the processing of the sword as well.

### a. Search of Edwards' Car

For the evidence collected from Edwards' car, Kofoed served as the State's primary foundational witness at Edwards' trial in March 2007. He testified that Edwards' car was to be searched twice. Joshua Connelly, a forensic scientist for the Douglas County sheriff's office, was to perform the first search, and then William Kaufhold, another CSI investigator, was to do a second, more detailed search later.

---

[11] Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014).

[12] See *State v. Kofoed, supra* note 1.

Kofoed testified that he had a chance to look at the vehicle before it was transported to the "sally port" where Connelly performed his search. Kofoed testified that he documented the contents, that the processing of the vehicle was photographed, and that the photographs "fairly and accurately depicted as [he] recalled them to be at the time that [he] observed that vehicle and processed that vehicle." Those photographs included photographs of the front and back seats of Edwards' car, a photograph of the garden shears removed from the car, and a photograph of the trunk.

Connelly and Kaufhold provided deposition testimony in lieu of testifying at the evidentiary hearing. Connelly confirmed that he conducted a preliminary search on May 17, 2006, and testified that he conducted the search by himself. Kaufhold testified that he and Kofoed conducted a search of the trunk area of the car on May 18, in which blood evidence was found on the trunk gasket and metal piece of the roof of the trunk. Kaufhold also testified that he conducted a third search of the car involving only the interior on May 19. Kaufhold testified that he conducted the third search by himself.

*i. Connelly's Preliminary Search*

Connelly testified that he was called around midnight on May 17, 2006, and was told that his services were needed at the Edwards' residence. Sometime after Connelly arrived at the scene, Edwards' car was transported from the garage of the residence to a sally port for examination. Connelly went to the sally port and took photographs of the exterior and interior of the car.

Connelly testified that he believed he was the first person to examine Edwards' car; however, Edwards argues that Christine Gabig's testimony and her photographs suggest otherwise. Gabig, another forensic scientist for the Douglas County sheriff's office, testified that she was the first CSI investigator who was called about the O'Grady investigation. When she showed up at the scene, Omaha Police Department detectives were

already at work. Gabig took a series of photographs of the scene, separate from Connelly's photographs of the car. One of Gabig's photographs showed the open trunk of Edwards' car while it was parked in the garage. Gabig testified that she did not open the trunk and that she did not know who did; it was open when she began documenting the scene. Another of Gabig's photographs showed a shovel leaning against a pole or pillar in the garage. Gabig stated that she had no personal knowledge of where the shovel had been before it appeared in the photograph, but that she was told that Omaha police detectives had removed it from Edwards' car.

Connelly had also taken a photograph of the shovel. The photograph showed the shovel in the back seat of the car with a paper bag over the "business end." Connelly testified that when the shovel was first observed, it was not in the car and did not have a paper bag over it. He stated that the shovel had been propped up against a pillar inside the garage and that someone had put a bag over it and put it in the back of the car. When asked if he had seen any red stains on the shovel, Connelly testified that he could not recall. He testified that if he would have seen any red stains, he would have documented them, but Connelly did not document any stains on the shovel.

Gabig later examined the shovel, but did not report seeing any blood evidence. At Edwards' trial, Kofoed testified that he transported a swab of the shovel, which was collected by another CSI investigator at Kofoed's direction, to UNMC on May 30, 2006. The item tested positive for DNA and was consistent with that of O'Grady's.

In addition to the passenger compartment of the car, Connelly also searched the trunk. He documented how the trunk appeared when he first opened the lid. He then began to remove items in "layers," documenting the scene before and after he removed each item. When Connelly came across the garden shears, he photographed them and bagged them separately from other evidence.

One handle of the garden shears had a red mark on it, and Connelly documented the red mark in a photograph. Connelly testified that he did not attempt to swab the garden shears or determine whether the red mark was blood, because he thought it would be better to send the entire item to UNMC rather than consume the small sample by conducting a presumptive test. Kofoed took the garden shears to UNMC for DNA testing on May 22, 2006. The garden shears tested positive for DNA and were consistent with that of O'Grady's.

When Connelly was asked if he recalled finding any blood evidence at any point during his search, Connelly stated that he did not find any blood, but that he could not recall if he was specifically looking for blood. His task was "to document the vehicle, document the contents of the vehicle, and collect anything that could be of evidentiary value. It wasn't to look for trace evidence. It wasn't to look specifically for blood."

### ii. Kaufhold and Kofoed's Search of Trunk

The next day, May 18, 2006, Kaufhold and Kofoed conducted the second search of the car. Kaufhold's report reflects that Kofoed advised him to concentrate on the trunk and rear exterior of Edwards' car. This search led to the discovery of bloodstains on the roof of the trunk and on the rubber gasket. A portion of the roof was then cut out of the car with a jigsaw, and the rubber gasket was removed. Kaufhold testified that he was the first to report finding what appeared to be a potential bloodstain in the trunk and that the first discovery was on the gasket. Kofoed transported the gasket and metal plate to UNMC for testing. Both items tested positive for DNA and were consistent with that of O'Grady's.

### b. Sword

Investigators found swords and knives in Edwards' closet. Those items were stored in CSI's biohazard room from May 17 to 31, 2006. On May 31, Kofoed directed Gabig to process

the swords and knives for any blood or trace evidence. Gabig testified that the tip of one of the swords produced a positive presumptive blood test. However, the presumptive test done on the sheath of the sword came back negative. A deputy then transported the sword to UNMC for DNA testing. The sword tested positive for DNA and was consistent with that of O'Grady's.

The district court found that there was "little to no evidence" Kofoed fabricated any evidence in this case and that even assuming arguendo that there existed some possibility that some of the evidence was fabricated, Edwards failed to offer any evidence that the State knowingly used fabricated evidence.

### (b) State's Knowing Use of Fabricated Evidence

Although there were at least three prosecutors involved in Edwards' trial, Edwards chose to present the testimony of only one at the evidentiary hearing, who testified that he did not suspect Kofoed of fabricating evidence in Edwards' case and was not aware at the time of Edwards' trial that Kofoed was suspected of fabricating evidence in the Stock case. Edwards did not offer any evidence to rebut the prosecutor's testimony. The district court found that Edwards did not establish that the State knowingly used false evidence to secure Edwards' convictions.

On appeal, Edwards argues that he was not required to prove that the prosecutor knew about Kofoed's fabricating evidence, because the prosecutor is not the only agent of the State. Instead, Edwards asserts that it was sufficient that he proved Kofoed, acting as a state agent, fabricated blood evidence and provided the foundation for that evidence as a witness at Edwards' trial. In support of his argument, Edwards cites *Edwards II*, wherein we stated, "At an evidentiary hearing, it is Edwards' burden to establish that state officers involved in the investigation or prosecution knowingly used

false evidence to secure his conviction[s]."[13] Relevant to this appeal, Edwards claims that Kofoed fabricated the blood evidence on the items recovered during the search of Edwards' car: the shovel, garden shears, trunk gasket, and trunk roof. Edwards also claims that Kofoed planted blood evidence on the sword while it was stored in CSI's biohazard room. Edwards does not claim and has never claimed that Kofoed fabricated any of the evidence collected from his bedroom, with the exception of the sword.

### (c) Conflict of Interest

We turn now to the evidence relevant to the issue of whether Edwards' trial counsel operated under a conflict of interest. Although we do not consider whether Edwards' *appellate* counsel labored under a conflict of interest, we recite the facts surrounding Lefler's subsequent representation of Kofoed, because it could be argued that such facts are relevant to the determination of whether Lefler had a conflict of interest at the time of trial.

In *Edwards II*, we explained Edwards' allegations concerning the purported conflict of interest as they were set forth in Edwards' original postconviction motion, as well as some of the evidence supporting those allegations:

> Edwards alleged that by September 2006, it was clear that Kofoed had planted blood evidence while investigating the Stocks' murders. He alleged that a reasonably diligent defense attorney would have known Kofoed was suspected of planting evidence while investigating the Stocks' murders. And he alleged that Lefler knew of these allegations because of his friendship with Kofoed. He claimed that Lefler repeatedly cited his friendship with Kofoed during his representation of Kofoed in the federal and state trials.

---

[13] *Edwards II, supra* note 1, 284 Neb. at 403, 821 N.W.2d at 699.

In fact, this record supports Edwards' contention that Lefler had a personal relationship with Kofoed. Before trial, Edwards moved to exclude Kofoed's testimony because of his televised demonstration of blood splatters. In arguing for the motion, Lefler referred to his friendship with Kofoed:

"I'm going to ask the Court to prevent Dave Kofoed, who's a friend of mine and I like him a ton . . . I'm going to ask you to prevent him from testifying in this particular case as a consequence of the TV demonstration that he gave. . . .

. . . .

". . . [W]hat we are worried about for . . . Edwards is that there's going to be some juror who halfway through the trial is going to remember seeing this TV clip.

"And Dave Kofoed's a great—a nice man, smart guy. And so I'm just worried that halfway through the trial it clicks in some juror's mind."[14]

Other evidence in support of Edwards' contention included statements made by Lefler to Kofoed in a deposition which took place in October 2006, prior to Edwards' trial, including:

Dave, I always feel awkward interviewing you, cross-examining you, because we've become friends. I've used you, I'm a special prosecutor, but we both have a job to do and I'm sure you understand that.

. . . .

. . . And I'm embarrassed to ask this question because we are friends, but this is a murder investigation: Have you before been reprimanded by either the [Omaha Police Department] or the sheriff's department while you've been in their employ?"

Sometime after the remand, Edwards learned that Lefler began to represent Kofoed in June 2008 while still representing Edwards on direct appeal. Although the district court

---

[14] *Id.* at 407-08, 821 N.W.2d at 702.

refused to consider whether Edwards' appellate counsel labored under a conflict of interest in its order denying postconviction relief, it allowed Edwards to "make his record" at the evidentiary hearing.

Lefler was the only witness called at the evidentiary hearing to testify about the alleged conflict of interest. Lefler testified that at the time of Edwards' trial, he knew who Kofoed was, but adamantly denied any friendship with him. Lefler knew of Kofoed because Kofoed, had testified in a few cases in which Lefler had represented other individuals. Kofoed had also testified for Lefler in a case where Lefler served as a special prosecutor. But Lefler explained that he and Kofoed never went out for dinner or drinks together or did any other kind of "friend-related activity."

As for Lefler's statements during Kofoed's deposition and during the trial that tended to indicate a friendship between Lefler and Kofoed, Lefler explained that this was a trial strategy that he had used throughout his career with witnesses other than Kofoed. He explained:

> [I]f I'm nice to a cop, the cop's going to tell me something he or she might not ordinarily tell me, and that's a benefit to my client. And so what I should have said, you know, now that I have been — now that my feet has [sic] been held to the fire, the Supreme Court saying that I was a jerk because I was friends with Dave Kofoed, I should have said at that time he was a professional acquaintance of mine.

Lefler also adamantly denied having any knowledge of others' suspicions that Kofoed was planting evidence at the time he filed Edwards' direct appeal or any time prior. He testified that he did not learn of the allegations against Kofoed until June 2008, when Kofoed called him and requested a visit. Lefler testified that at that time, he had "no clue" why Kofoed called him or wanted to meet. When they met, Kofoed informed Lefler that the FBI had interviewed him about the Stocks' murder investigation and that an agent had told

Kofoed that his story did not "'smell right.'" Lefler agreed to represent Kofoed a couple of days later.

Lefler testified that before he agreed to represent Kofoed, he considered whether that representation would cause a conflict of interest. Lefler testified that he researched the issue and even reached out to the Nebraska State Bar Association. A member of the Counsel for Discipline advised him that "'the film's in the can,'" meaning that Lefler's representation of Kofoed would not affect Edwards' case, even though there were still briefs to be written for Edwards on direct appeal. Lefler also explained that it was mainly his cocounsel who wrote the briefs and that she was the one who argued before this court.

After the evidentiary hearing, the district court determined that Edwards' trial counsel did not operate under a conflict of interest and, therefore, rejected his ineffective assistance of counsel claim.

## III. ASSIGNMENTS OF ERROR

Edwards assigns, combined and restated, that the district court erred in (1) refusing to grant leave to amend his original postconviction motion; (2) failing to find that Edwards' counsel had an actual conflict of interest, in violation of the 6th and 14th Amendments to the U.S. Constitution; and (3) failing to find that the State knowingly used fabricated evidence, in violation of Edwards' due process rights.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews a refusal to grant leave to amend for abuse of discretion.[15]

[2] A defendant requesting postconviction relief must establish the basis for such relief, and the factual findings of the district court will not be disturbed unless they are clearly erroneous.[16]

---

[15] *State v. Mata*, 280 Neb. 849, 790 N.W.2d 716 (2010).

[16] *State v. Benzel*, 269 Neb. 1, 689 N.W.2d 852 (2004); *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004).

[3] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[17] an appellate court reviews such legal determinations independently of the lower court's decision.[18]

## V. ANALYSIS

[4] The first issue is whether the district court abused its discretion in overruling Edwards' motion to amend his original postconviction motion. An appellate court reviews a refusal to grant leave to amend for abuse of discretion.[19] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[20] We need not consider whether the district court's reason for denying the motion for leave to amend here was tenable, because we conclude that the ruling did not deprive Edwards of a substantial right or just result and, therefore, could not have been an abuse of discretion.

We must assume that the substantial right that Edwards claims is his right—if such right exists—to be heard on his "new" claims. But assuming that right exists (i.e., that Edwards did not waive those claims by failing to assert them

---

[17] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),

[18] *State v. Benzel, supra* note 16.

[19] *State v. Mata, supra* note 15.

[20] *Arens v. NEBCO, Inc.*, 291 Neb. 834, 870 N.W.2d 1 (2015); *Kercher v. Board of Regents*, 290 Neb. 428, 860 N.W.2d 398 (2015); *Richards v. McClure*, 290 Neb. 124, 858 N.W.2d 841 (2015); *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015); *Fox v. Whitbeck*, 286 Neb. 134, 835 N.W.2d 638 (2013).

in a prior appeal in which he had a motive and opportunity to do so[21]), the district court's ruling would not have deprived Edwards of that right. At the time of filing his motion to amend the postconviction proceeding, assuming without deciding that Edwards was not procedurally or time barred, Edwards could have filed a second postconviction proceeding alleging the claims he attempted to raise on remand. We have held that a subsequent postconviction motion is allowed when the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of the filing of the prior motion.[22] Edwards asserts that such is the case here. Accordingly, we conclude that Edwards could have filed a second postconviction proceeding asserting the claims that he alleged he was unable to raise in the first postconviction proceeding. Therefore, the district court did not deprive Edwards of a substantial right or just result and did not abuse its discretion by denying his motion to amend his first postconviction claim. Edwards' first assignment of error is without merit.

The second issue is whether the district court erred in determining that Edwards' trial counsel did not operate under an actual conflict of interest. In *Edwards II*, we set forth the relevant rules for resolving this claim:

The right to effective assistance of counsel entitles the accused to his or her counsel's undivided loyalties, free from conflicting interests. But a defendant who raised no objection at trial must show that an actual conflict of interest existed and that the conflict adversely affected his lawyer's performance. If the defendant satisfies this requirement, the defendant is not required to show that the Sixth Amendment violation had a probable effect on the outcome of the trial to obtain relief.

---

[21] See *County of Sarpy v. City of Gretna*, 276 Neb. 520, 755 N.W.2d 376 (2008).

[22] See *State v. Newton*, 202 Neb. 361, 275 N.W.2d 297 (1979).

In 2002, in *Mickens v. Taylor*, [535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 152 L. Ed. Ed. 2d 291 (2002),] the U.S. Supreme Court stated that the "actual conflict" inquiry is not separate from a performance inquiry: "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Thus, we have stated that when an actual conflict exists, there is no need to show that the conflict resulted in actual prejudice to the defendant (meaning no need to show the outcome of the proceeding was affected). But the substantive analysis is the same. If the defendant shows that his or her defense counsel faced a situation in which conflicting loyalties pointed in opposite directions and that his or her counsel acted for the other client's interests and against the defendant's interests, prejudice is presumed.[23]

But the district court found that Lefler did not have an actual conflict of interest at the time he served as Edwards' trial counsel. It reasoned that "[t]here is no evidence that any relationship existed between Kofoed and Lefler before June, 2008." Because there was *some* evidence of a relationship, we agree with Edwards that this latter statement by the district court was an overstatement. However, we find that Edwards failed to prove by a preponderance of the evidence that his trial counsel operated under a conflict of interest.

The record simply does not support a finding that Lefler had such a loyalty to Kofoed that would have tempted him at trial to act against Edwards' interests. Although Lefler's statements at the deposition and Edwards' trial suggested some sort of relationship between Lefler and Kofoed, Lefler clarified at the evidentiary hearing that this relationship was strictly professional. Lefler testified that he and Kofoed never went out to dinner or out for drinks or any other kind of activity typically done with friends. No evidence was presented

---

[23] *Edwards II, supra* note 1, 284 Neb. at 406-07, 821 N.W.2d at 701.

at the evidentiary hearing to rebut Lefler's testimony, except that Edwards offered depositions and trial testimony wherein Lefler and Kofoed made statements suggesting that they were "friends," a term which has lost meaning in the age of "Facebook" and other social networking sites. Even assuming that Lefler had any loyalty to Kofoed, Edwards fails to point to any situation during or prior to his trial in which Lefler acted in Kofoed's interest and against Edwards' interest. We therefore conclude that the district court did not err in finding that Edwards' trial counsel did not operate under a conflict of interest. Edwards' second assignment of error is without merit.

The third and final issue in this case concerns whether the State knowingly used fabricated evidence in violation of Edwards' due process rights. Because Edwards had the burden to prove by a preponderance of the evidence that Kofoed fabricated evidence in his case,[24] we interpret the district court's statement that there was "little to no evidence that Kofoed fabricated evidence in this case" as a finding that Kofoed did not fabricate evidence in this case. The district court also found that there was no evidence that the State knowingly used false evidence to secure Edwards' convictions. We review each of these factual findings for clear error.[25]

The district court did not commit clear error in finding that Kofoed did not fabricate evidence in Edwards' case. Edwards does not offer any direct evidence supporting his allegations, and the circumstantial evidence is limited. Edwards relies heavily on the fact that Kofoed has been found to have fabricated evidence in two other investigations—the Stocks' and Brendan's murder investigations. He claims that the similarities between those investigations and the investigation here show that Kofoed also fabricated evidence here. But contrary

---

[24] See, *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006); *State v. Curtright*, 262 Neb. 975, 637 N.W.2d 599 (2002).

[25] *Edwards II, supra* note 1.

to Edwards' argument, we interpret the evidence in those investigations as evidence that Kofoed did *not* fabricate evidence here.

[5] We consider Kofoed's modus operandi. Modus operandi is a characteristic method used in the performance of repeated criminal acts.[26] "*Modus operandi* means, literally, 'method of working,' and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer."[27] In the Stocks' and Brendan's murder investigations, Kofoed's modus operandi was not to plant the victim's blood on the physical evidence; rather, Kofoed's modus operandi had been to swab blood known to be the victim's and then submit it for DNA testing, falsely claiming to have swabbed physical evidence connected to the defendant, whom Kofoed believed committed the crime. With respect to the blood evidence on the sword, trunk gasket, and trunk roof, Kofoed did not claim to take swabs of those items and submit them to UNMC; instead, those items were taken directly to UNMC for the DNA analyst to swab. The shovel was swabbed by another CSI investigator and transported to UNMC by Kofoed. But there is no evidence that the shovel was later tested and found to have no DNA evidence on it. Thus, we find that Edwards' argument concerning the similarities in the three investigations is misplaced.

The only relevance of the Stocks' and Brendan's murder investigations is that they show Kofoed's propensity to fabricate evidence. But a person's propensity to commit an act is insufficient by itself to prove that the person committed the act in the instant case. In other words, Kofoed may have fabricated evidence in those cases, but it does not mean he fabricated evidence here.

---

[26] See *State v. Craig*, 219 Neb. 70, 361 N.W.2d 206 (1985).

[27] *Id.* at 77, 361 N.W.2d at 213 (quoting *People v. Barbour*, 106 Ill. App. 3d 993, 436 N.E.2d 667, 62 Ill. Dec. 641 (1982)).

Edwards also suggests that Kofoed's testimony at the trial shows that he had the opportunity to plant the evidence. But, as the district court correctly noted, although Kofoed testified that he had the chance to look at Edwards' car before it was transported to the sally port, there was no evidence that Kofoed had access to the car without the observation of others. To the contrary, Gabig testified that when she arrived shortly after CSI's team, Omaha police and Douglas County sheriff's office personnel were already at work there.

Besides lack of opportunity, we also note a lack of motive to fabricate evidence in this case. In the Stocks' and Brendan's murder investigations, there was little more than a confession connecting the crime to the person that Kofoed believed committed it. Here, O'Grady's blood was all over Edwards' bedroom. More than half of the bottom of Edwards' mattress was covered in O'Grady's blood. There was blood on the bedding, headboard, nightstand, and clock radio. There was blood on the bookcase, laundry baskets, and a chair in the room. There was also blood on the towels in a trash bag in the garage. Edwards' explanation as to how the blood happened to be present in all those places was implausible. With such an overwhelming amount of evidence, we see no reason for Kofoed to be motivated to fabricate evidence in this case.

Nevertheless, Edwards suggests to this court that Kofoed transferred blood from Edwards' mattress to the sword, shovel, garden shears, trunk gasket, and trunk roof. Edwards' theory rests solely on Connelly's testimony that this kind of transfer is hypothetically possible. But there was no evidence that such transfer was actually done in this case. Edwards notes that the blood spatter expert who testified at Edwards' trial was "never asked whether . . . the sample might have been diluted, or [about] the period of time the stain had been on the metal plate before removal."[28] This statement incorrectly assumes that it is the State's burden to prove that Kofoed did not fabricate

_____

[28] Brief for appellant at 32.

evidence; to the contrary, it is Edwards' burden to prove that he did.[29]

We conclude that the district court did not err when it determined that Kofoed did not fabricate evidence in this case.

In order for the State to knowingly use fabricated evidence, there must be fabricated evidence. Because we affirm the district court's finding that Kofoed did not fabricate evidence in this case, and because there is no evidence that anyone else fabricated evidence in this case, we conclude that the district court did not err in finding that Edwards failed to prove that the State knowingly used fabricated evidence in order to obtain his convictions.

## VI. CONCLUSION

The district court did not deprive Edwards of a substantial right or just result when it overruled his motion to amend his original postconviction motion. Edwards could have filed a second postconviction motion alleging the same claims. Therefore, the district court did not abuse its discretion in overruling Edwards' motion to amend. We also conclude that the district court did not err in finding that Edwards' trial counsel did not operate under a conflict of interest. It did not err in finding that Kofoed did not fabricate evidence in this case and that the State did not knowingly use false evidence to obtain Edwards' convictions. We therefore affirm the district court's denial of Edwards' motion for postconviction relief.

AFFIRMED.

KELCH, J., not participating.

---

[29] See *Edwards II, supra* note 1.

STACY, J., concurring.

I concur, and write separately not to express disagreement with this court's analysis, but to suggest another basis for the correct conclusion that the district court did not err in denying Edwards' request to amend his postconviction motion after

remand. In my opinion, the district court did not err, because Nebraska's postconviction statutes do not allow a prisoner to amend his or her postconviction motion after the district court has entered an order denying postconviction relief without an evidentiary hearing.[1]

As the majority opinion notes, in *State v. Edwards* (*Edwards II*),[2] we concluded that only two of the many issues raised in Edwards' postconviction motion warranted an evidentiary hearing. As to Edwards' other postconviction claims, we affirmed the district court's order denying postconviction relief. We remanded the cause for an evidentiary hearing on only two of the postconviction claims. After the mandate was spread on remand, Edwards sought leave to amend his postconviction motion to assert additional grounds for relief. The district court denied the motion to amend, and Edwards assigns error to this ruling.

In *State v. Robertson*,[3] we observed that postconviction relief under Neb. Rev. Stat. § 29-3001 (Cum. Supp. 2014) is a very narrow category of relief,[4] subject to specific statutory pleading requirements.[5] And we held that nothing in Nebraska's postconviction statutes authorizes a prisoner to amend a postconviction pleading after the court has determined it is insufficient to warrant an evidentiary hearing.[6] We concluded that Nebraska's postconviction statutes simply do not contemplate the opportunity to amend a pleading after the court determines the pleading is insufficient to necessitate an evidentiary hearing.[7]

---

[1] *State v. Robertson, post* p. 29, ___ N.W.2d ___ (2016).

[2] *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

[3] *Robertson, supra* note 1.

[4] *State v. Payne*, 289 Neb. 467, 855 N.W.2d 783 (2014).

[5] *Robertson, supra* note 1.

[6] *Id.*

[7] *Id.*

Edwards did not seek leave to amend his postconviction motion until after the court had denied an evidentiary hearing on his postconviction claims, after he had appealed from that final order,[8] and after the matter had been remanded to the district court with directions to conduct an evidentiary hearing on only two of the claims. Given that procedural posture, it was not error for the district court to deny Edwards' motion to amend.

CASSEL, J., joins in this concurrence.

---

[8] *State v. Banks*, 289 Neb. 600, 856 N.W.2d 305 (2014) (order denying evidentiary hearing on postconviction is final, appealable order).