Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/18/2026 08:09 AM CDT

**State of Nebraska, appellee, v.
Raymond Mata, Jr., appellant.**
___ N.W.3d ___

Filed June 18, 2026.    No. S-24-664.

1. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Postconviction: Evidence: Witnesses: Appeal and Error.** In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. An appellate court upholds the trial court's findings unless they are clearly erroneous.

4. **Postconviction: Judgments: Appeal and Error.** Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which an appellate court reviews independently of the lower court's ruling.

5. **Trial: Evidence: Appeal and Error.** The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

6. ____: ____: ____. Erroneous exclusion of evidence does not require reversal if the evidence would have been cumulative and other relevant evidence, properly admitted, supports the trial court's finding.

7. **Evidence: Words and Phrases.** Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.

8. **Rules of Evidence.** Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

9. **Constitutional Law: Criminal Law: Right to Counsel.** The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to effective assistance of counsel.

10. ____: ____: ____. The right to effective assistance of counsel entitles the accused to the undivided loyalty of an attorney, free from any conflict of interest.

11. **Conflict of Interest: Words and Phrases.** A conflict of interest exists when a defense attorney is placed in a situation inherently conducive to divided loyalties.

12. **Attorney and Client: Conflict of Interest: Words and Phrases.** The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard of another, where a lawyer's representation of one client is rendered less effective by reason of his or her representation of another client, or where it becomes a lawyer's duty on behalf of one client to contend for that which the lawyer's duty to another client would require him or her to oppose.

13. **Constitutional Law: Effectiveness of Counsel: Conflict of Interest: Proof.** To establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that his or her lawyer actively represented conflicting interests and that the actual conflict of interest adversely affected the lawyer's performance.

14. **Effectiveness of Counsel: Conflict of Interest: Proof.** While a defendant who shows that a conflict of interest actually affected the adequacy of his or her representation need not demonstrate prejudice, such conflict of interest must be shown to have resulted in counsel's conduct detrimental to the defense.

15. **Effectiveness of Counsel: Conflict of Interest.** An asserted conflict of interest must be actual, rather than speculative or hypothetical, before a conviction can be overturned on the ground of ineffective assistance of counsel.

16. **Appeal and Error.** An appellate court has the discretion to affirm, as it deems appropriate, a correct result that was reached below for the wrong reason.

17. **Postconviction.** The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.

18. **Postconviction: Pleadings.** The effect of Neb. Rev. Stat. § 29-3001(3) (Cum. Supp. 2024) is to require that all available grounds for postconviction relief must be stated in the initial postconviction motion and, once that motion has been judicially determined, any subsequent postconviction motion regarding the same conviction and sentence may be dismissed by the district court unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of filing the prior motion.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed.

Celeste Bacchi and Sylvia Irvin, Assistant Federal Public Defenders for District of Nevada, pro hac vice, and Peder Bartling for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

Funke, C.J., Cassel, Stacy, Papik, and Vaughn, JJ., and Moore and Bishop, Judges.

Funke, C.J.

## I. INTRODUCTION

Raymond Mata, Jr., appeals the order of the district court for Scotts Bluff County, Nebraska, dismissing his successive motion for postconviction relief as procedurally barred. Mata argues that his successive motion should have been allowed under *State v. Williams*,[1] because the counsel who represented him for his initial motion for postconviction relief had conflicts of interest that prevented that counsel from raising the ineffective assistance and conflicts of Mata's trial and appellate counsel. Because we find no merit to that argument or to Mata's other arguments, we affirm the order of the district court.

---

[1] *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017).

## II. BACKGROUND

### 1. Trial and Sentencing

We have opined on Mata's convictions and sentences on multiple occasions.[2] As is relevant here, we need note only the following.

Mata was tried and convicted of first degree murder and kidnapping in the killing of Adam Gomez, the 3-year-old son of a woman with whom Mata had had an intimate relationship. The presiding judge sentenced Mata to life imprisonment for kidnapping, and after finding the existence of an aggravating circumstance, exceptional depravity, a three-judge panel sentenced Mata to death for first degree premeditated murder.

On direct appeal, we affirmed Mata's convictions, as well as the sentence of life imprisonment imposed for the kidnapping conviction. However, based on *Ring v. Arizona*,[3] we vacated Mata's death sentence and remanded the cause for resentencing on the first degree murder conviction.

On remand, a jury unanimously found the existence of the aggravating circumstance of exceptional depravity. Thereafter, a three-judge panel heard evidence on mitigating circumstances and sentencing disproportionality. Ultimately, the panel determined that the penalty was not excessive or disproportionate to the penalty imposed in similar cases and sentenced Mata to death.

Mata appealed his resentencing, and we affirmed the imposition of his death sentence. However, we determined that electrocution as a method of execution was cruel and unusual

---

[2] See, *State v. Mata*, 304 Neb. 326, 934 N.W.2d 475 (2019); *State v. Mata*, 280 Neb. 849, 790 N.W.2d 716 (2010), *disapproved on other grounds, State v. Robertson*, 294 Neb. 29, 881 N.W.2d 864 (2016); *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008); *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *disapproved on other grounds, State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025).

[3] *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

punishment in violation of the Nebraska Constitution and stayed Mata's execution.

During the proceedings described above, which lasted from 1999 to 2008, Mata was represented by the Nebraska Commission on Public Advocacy (NCPA). NCPA staff attorneys Jeffery A. Pickens and Jerry L. Soucie were Mata's "primary lawyers," but NCPA chief counsel James R. Mowbray also represented Mata.

## 2. Initial and Amended Motions
### for Postconviction Relief

In 2009, Mata filed a "*Pro Se* Verified Motion for Postconviction Relief and Request for Appointment of Counsel," although there was subsequently testimony that the NCPA "prepared" the motion for Mata. The motion raised two claims of ineffective assistance of trial and appellate counsel, as well as five other grounds for relief.

The district court denied Mata's motion for postconviction relief without an evidentiary hearing. Mata's request for the appointment of counsel was also denied, and he was not granted leave to amend.

Mata appealed, and the Scotts Bluff County public defender's office was appointed to represent him on appeal. At that time, the Scotts Bluff County public defender was Bernard Straetker. As discussed below, Straetker had served as an NCPA commissioner between 2004 and 2008, when the NCPA represented Mata for his resentencing.

We found that the district court abused its discretion in denying Mata leave to amend. As such, we reversed the order of the district court and remanded the cause with directions to appoint counsel for Mata and grant him leave to amend.

On remand, the Scotts Bluff County public defender's office was again appointed to represent Mata. When the attorney in that office who had been handling Mata's postconviction motion left in late 2011, Straetker personally took on the responsibility. Straetker filed an amended motion for

postconviction relief on Mata's behalf, followed by a second amended motion for postconviction relief. The second amended motion was the operative pleading. It raised the same two claims of ineffective assistance of trial and appellate counsel that Mata had raised in his pro se motion, as well as eight other grounds for relief.

The district court denied Mata's second amended motion for postconviction relief without an evidentiary hearing. Mata appealed, and in 2019, we affirmed the order of the district court.

### 3. Successive Motion for Postconviction Relief

In 2021, represented by different counsel, Mata filed a 282-page successive motion for postconviction relief. In so doing, Mata relied on our statement in *Williams* that a defendant "may raise . . . ineffective assistance of appellate counsel claims in [a] second postconviction motion" where the second motion is the defendant's "first opportunity" to raise those claims.[4] Mata argued that his situation was like that of the defendant in *Williams* because, due to Straetker's "conflicts and ineffectiveness," Mata's successive postconviction motion was his "'first meaningful opportunity'" to raise the ineffective assistance and conflicts of his trial and appellate counsel.

Mata's successive motion for postconviction relief raised 28 claims (many with subparts) regarding the effectiveness of his trial and appellate counsel and his initial postconviction counsel, as well his trial and sentencing. Mata conceded that some of those claims had been raised "in [his] direct appeal, the appeal of his penalty retrial, or in his first postconviction proceeding." However, Mata said that he had raised those claims again in the present motion because they "must be considered to properly analyze [his] claim that cumulative error render[ed] his convictions and death sentence

---

[4] *Williams, supra* note 1, 295 Neb. at 590, 889 N.W.2d at 114.

unconstitutional." As relevant here, one of Mata's claims was that Pickens had conflicts of interest that "unconstitutionally . . . impaired" his representation of Mata.

The State responded that Mata's claims were time barred, procedurally barred, or otherwise unavailing.

A records hearing was held and additional briefing was taken. Thereafter, the district court issued an order opining that "*Williams* is not on all fours with this case," because the defendant in *Williams* had the same counsel for both his direct appeal and his first postconviction motion. Nonetheless, the court set the matter for hearing on the "limited issue" of whether Straetker had a conflict of interest that prevented him from raising claims of ineffective assistance of trial and appellate counsel and whether Pickens had a conflict of interest.

### 4. Evidentiary Hearing on Mata's Successive Motion for Postconviction Relief

An evidentiary hearing was subsequently held on Straetker's and Pickens' alleged conflicts. At that hearing, Mata offered 210 exhibits that, broadly speaking, purported to show: (1) Pickens had a conflict of interest due to his prior prosecution of Mata and Mata's family members, his investigation of Mata for another murder, and his prior representation of Gomez' grandfather; (2) Straetker had a conflict of interest due to his prior service as an NCPA commissioner, his incentives as a public defender to maintain a good relationship with the NCPA, his alleged advice that Mata accept representation by the NCPA, and his prior representation of Gomez' grandfather; and (3) the claims Straetker raised on postconviction as compared to those that a conflict-free counsel would allegedly have raised. Among the exhibits Mata offered were declarations by Straetker and Pickens, as well as the depositions of Straetker, Pickens, Mowbray, and Robert Lindemeier, another former NCPA commissioner.

The State, in turn, offered one exhibit that detailed its objections, primarily on relevancy grounds, to the bulk of Mata's

proposed exhibits. The State did not object to the declarations and depositions noted above, although it did object to specific testimony in the depositions.

The district court admitted into evidence the State's exhibit and all of Mata's exhibits to which the State did not object. It also took under advisement the admission of the remaining exhibits and the State's objections to the deposition testimony.

The following paragraphs summarize the pertinent evidence admitted at or after the hearing. Other evidence is discussed later in the opinion as it relates to our analysis of the parties' arguments. Our discussion of the evidence is informed by the parties' briefs and by our own review of the record. However, insofar as there may be additional evidence in the record that supports Mata's arguments, but that was not cited by him in his brief, we would note that an appellate court ordinarily does not scour the record in search of facts that might support an appellant's claim.[5]

### (a) Evidence Regarding Pickens' Alleged Conflicts

There was evidence that while Pickens was employed by the Scotts Bluff County public defender's office between 1991 and 1994, he represented Gomez' grandfather and saw the grandfather "frequently" at the courthouse. Pickens said that he "always enjoyed seeing" Gomez' grandfather and that the two were "friendly with each other." Pickens also said that later, during Mata's "guilt trial," Gomez' grandfather "attended every day." Pickens could not remember whether he told Mata about his "representation, relationship, or interactions" with Gomez' grandfather.

There was also evidence that while Pickens was employed by the Scotts Bluff County Attorney's office between 1994 and 1996, he prosecuted Mata and members of Mata's family and investigated Mata for another murder. Pickens and

---

[5] See *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021).

Mowbray (who was Pickens' supervisor at all relevant times) both testified that when the NCPA was approached about representing Mata in Gomez' death, they were cognizant of the conflict or the appearance of a conflict. Mowbray, in particular, said that Mata's convictions in cases prosecuted by Pickens could have "play[ed] a role" in Mata's sentencing in the capital proceeding and that Pickens would have been responsible for interviewing members of Mata's family, some of whom he had prosecuted, as "part of a mitigation investigation."

However, both Pickens and Mowbray indicated that Mata had waived the conflict. Pickens said he discussed the matter with Mata, first by telephone and later in person, and confirmed that Mata knew Pickens had previously prosecuted and investigated him and that both he and Mata were "comfortable" with his representing Mata. Mowbray testified similarly that he viewed the "issue" as "null and void" once there was a written waiver from Mata. Pickens said he did not think he secured a written waiver from Mata. Mowbray said he had not reviewed a written waiver prior to his deposition, with the potential implication that there was such a waiver. However, Mowbray agreed that waivers could be oral.

### (b) Evidence Regarding Straetker's Alleged Conflicts

The evidence showed that as a result of his work in the Scotts Bluff County public defender's office, Straetker knew Mata prior to March 17, 1999, the date when Mata was arraigned for Gomez' murder. However, while Straetker agreed he was "probably" in the courthouse that day, he did not recall talking to Mata "at or before [Mata's] arraignment." Straetker conceded that it was "possible" he or someone else from his office spoke to Mata about "accepting" representation by the NCPA, and Straetker said he had no "reason to dispute" Mata's claim that Straetker recommended Mata "accept[]" representation by the NCPA. Even so, Straetker indicated that he was unlikely to have made such a comment

because he was not then the public defender, and his "boss did not want us talking to anybody like that." Straetker also noted that indigent defendants do not have a choice of counsel; that the courtroom where Mata was arraigned was on the other side of the building; that there was heavy security surrounding Mata, and he might not have been allowed to talk to Mata; and that it was not his "practice to . . . go up and talk to people" in Mata's situation.

The evidence also showed that subsequently, in 2000, while still with the public defender's office, Straetker represented Gomez' grandfather. Straetker admitted that he never disclosed this fact to Mata.

Straetker similarly admitted that in March 2012, shortly after he personally began working on Mata's case, he told Mata he was "concerned there may be a conflict of interest in [his office's] representation of [Mata] in postconviction proceedings," because of his service as an NCPA commissioner. Straetker said his concern was based on his belief that another attorney who had served as an NCPA commissioner was not appointed to represent a former NCPA client on postconviction because that attorney had a conflict due to his service as a commissioner. However, Straetker said he "talked about" the issue with Mata and later learned that he was mistaken in his belief about why the other attorney was not appointed to represent the former NCPA client. Otherwise, Straetker said he thought he was "okay" to keep Mata's case because he was no longer a commissioner, and the commissioners "didn't have any direct involvement with any of the ongoing cases."

In contrast, Pickens, Mowbray, and Lindemeier all testified, at times over the State's objection, that current or former NCPA commissioners should not "accept[] postconviction appointments in cases where [the NCPA] served as trial or appellate counsel." According to Mowbray, this was because the claims raised on postconviction often involve ineffective assistance of counsel, and it is "difficult" for commissioners to raise such claims due to the relationships they build with

the NCPA attorneys. Mowbray was less sure there were concerns arising from "[i]nformation and insights that a commissioner receives that perhaps others might not be as privy to." Lindemeier similarly noted the relationships that commissioners develop with the NCPA attorneys. In addition, Lindemeier said it "doesn't pass the smell test" to argue that attorneys whom one had "overseen as a commissioner" were not effective when NCPA policies call for effective representation.

Mowbray was not "aware of any other instance where an active or former commissioner [had] accepted an appointment" to represent a former client of the NCPA on postconviction. He and Pickens also indicated they would support a policy prohibiting this, but the evidence showed this had "never been a policy."

### (c) Evidence Regarding NCPA

The evidence showed that the NCPA was created to relieve counties of the expenses that can arise from the appointment of counsel for indigent defendants, although the witnesses disagreed about the difficulties that public defenders faced in obtaining funds from county commissioners. Lindemeier said that "[a]s a public defender . . . , [he did not] get a lot of financial support from the [county] commissioners. They don't like to pay for . . . criminals." In contrast, Straetker said that he "didn't really have very many problems with . . . asking for money through the county commissioners." There was also evidence that the NCPA's taking a case had other benefits, including giving public defenders more time for other cases and "taking some pressure off of the local bar" in "messy" cases. The evidence similarly showed that the NCPA made sample motions and briefs available to criminal defense attorneys and provided other assistance to them.

According to the witnesses, the NCPA commissioners "hired" and had "oversight" over the chief counsel, and the chief counsel "reported" to them. The witnesses also said that the commissioners "evaluate[d]" or "review[ed]" the chief

counsel's performance annually, with one "consideration[]" being whether clients "were receiving . . . adequate representation." However, one witness who testified to this effect seemed to characterize this evaluation as a "housekeeping" matter, centered upon "whether [the chief counsel] should continue . . . in his position." There was also evidence that the commissioners adopted policies, **"signed off"** on expenses for expert witnesses and other items, and promoted the NCPA to legislators, judges, and county commissioners. However, the evidence showed that the commissioners were not "involved in [the] individual decisions that were made in the representation of any client," and the chief counsel never sought their "permission" to take specific positions in cases. The evidence likewise showed that the commissioners' review of expenses was limited to determining whether the expense was "a legitimate cost of the defense." Lindemeier, in particular, said he could not "recall ever even informally talking" about whether an expert should be retained.

In addition, the witnesses testified that, formally or informally, the commissioners received information about the NCPA's cases. Specifically, the witnesses said they received "case lists," identifying the NCPA's clients**,** the charges against them, their attorneys, and the case's procedural posture, as well as "financial reports" with "case costs." However, the witnesses said the information was provided purely for "aware[ness]" and involved matters of "public record." According to the witnesses, the commissioners were not aware of any "confidences" or "details," they knew nothing of the "guts of the case," they did not know the case strategy or litigation plans, and they had no access to the attorneys' files or communications. There was evidence that "Mata's case," and, in particular, rulings in Mata's case, were discussed with the commissioners, in part because "a lot of things that happened in that case . . . were pretty noteworthy and newsworthy." Also, Mowbray, who was the chief counsel

at the time, said he wanted the commissioners to be "aware" and "informed" of matters, such as the challenge to electrocution as a means of carrying out a death sentence, "[b]ecause of the cost of all of that, I wanted them to be aware that what we were doing wasn't cheap."

### 5. Subsequent Orders of District Court

After the hearing, the district court entered a journal entry ruling on the admission of Mata's exhibits. The court sustained the State's objections to the exhibits based on relevancy, except as to the objections made during the depositions. Subsequently, the court overruled all objections in the depositions and dismissed Mata's successive motion for postconviction relief.

The court began by noting that this case was unlike *Williams* because the counsel who filed Mata's direct appeal did not also file his initial postconviction motion. However, the court then concluded that "Mata's case [was] not a *Williams* situation" because Straetker had no conflict of interest. In so concluding, the court observed that Mata was tried and sentenced before Straetker began his term as an NCPA commissioner and that Straetker was not appointed as Mata's postconviction counsel until "years after" Mata was resentenced and Straetker's term as commissioner ended. The court acknowledged Mata's argument that the commissioners were "involved in" and "supervis[ed]" the cases handled by the NCPA attorneys, "'directly and indirectly supervised'" Mata's attorneys, and were "privy to information" about Mata's case. However, the court found that the evidence did not support Mata's argument here. The court also opined that in acting as postconviction counsel, Straetker "was attentive" to the issue of conflicts, but ultimately did not believe there was a conflict. The court similarly observed that Straetker had raised claims of ineffective assistance of trial and appellate counsel, as well as other claims, on Mata's behalf.

The court also concluded that Mata waived any conflict based on Pickens' prosecution of Mata and members of Mata's family. The court said it was "unclear whether a written waiver was obtained," but it found that there was "no dispute" that Mata was aware of this circumstance and waived the conflict.

As such, the court concluded that Mata was "not entitled to bring" a successive postconviction motion. In particular, the court said that Mata's present claims could have been raised either on direct appeal or in his initial postconviction proceedings.

Mata appealed, and the case was assigned to our docket.[6]

## III. ASSIGNMENTS OF ERROR

Mata assigns, restated, renumbered, and reordered, that the district court erred in (1) sustaining the State's objections to his exhibits; (2) rejecting his argument that due to conflicts on the part of his initial postconviction counsel, his successive motion for postconviction relief was his first opportunity to raise his claims; (3) finding that he waived any conflict on Pickens' part; (4) dismissing his successive motion for postconviction relief on procedural grounds; and (5) not granting him a further evidentiary hearing on the merits of his claims.

## IV. STANDARD OF REVIEW

[1,2] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[7] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[8]

---

[6] See Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 2024).

[7] *State v. Price*, 320 Neb. 1, 26 N.W.3d 70 (2025).

[8] *Id.*

[3] In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact.[9] An appellate court upholds the trial court's findings unless they are clearly erroneous.[10]

[4] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which an appellate court reviews independently of the lower court's ruling.[11]

## V. ANALYSIS

### 1. Any Error in Excluding Mata's Exhibits Was Harmless

Mata claims that the district court abused its discretion in excluding most of his proposed exhibits on relevancy grounds. Mata argues that relevancy is a "'low bar'"[12] and "'requires only that the probative value be something more than nothing.'"[13] Mata maintains that the excluded exhibits cleared this bar and are relevant for various reasons. As such, Mata argues that the evidence was admissible under Neb. Rev. Stat. § 27-402 (Reissue 2016), which prescribes that "[a]ll relevant evidence is admissible" except as otherwise provided. The State, in turn, argues that the district court did not abuse its discretion in excluding Mata's exhibits. The State also argues that even if the district court did abuse its discretion here, any error was harmless because the evidence was cumulative. The table below illustrates Mata's claims regarding his exhibits and their purported relevancy:

---

[9] *State v. Betancourt-Garcia*, 317 Neb. 174, 9 N.W.3d 426 (2024).

[10] *Id*.

[11] *State v. Harms*, 315 Neb. 445, 996 N.W.2d 859 (2023).

[12] Brief for appellant at 36 (quoting *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019)).

[13] Brief for appellant at 36 (quoting *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020)).

| Exhibit Numbers and Contents | Purported Relevancy |
|---|---|
| 1001-1006 (prior Nebraska Supreme Court opinions in Mata's case and related briefs) | Relevant to compare the claims Mata asserts should have been raised to those appellate counsel raised |
| 1001-1006, 1008, 1009, 1013 (prior Nebraska Supreme Court opinions in Mata's case and related briefs); 1016, 1046, 1059-1062, 1068, 1069, 1165 (materials related to trial and sentencing); 1176-1178 (materials related to initial postconviction proceeding) | Relevant to the constitution-ality of Mata's conviction and death sentence |
| 1017-1034, 1069, 1070, 1187 (materials related to trial and sentencing); 1048-1058 (records related to Pickens' prior prosecution of Mata and Mata's family members); 1063-1067 (infor-mation about Mata's mental health and family back-ground); 1170-1175 (NCPA correspondence regarding Mata's case); 1179 (death penalty defense manual); 1185, 1186 (Scotts Bluff County budgets and audits) | Show the claims that conflict-free counsel would allegedly have raised on postconviction |

| Exhibit Numbers and Contents | Purported Relevancy |
|---|---|
| 1048-1058, 1085, 1170, 1171 (records related to Pickens' prosecution of Mata and Mata's family members); 1172 (materials related to sentencing); 1173 (records related to Pickens' investigation of Mata for murder) | Show Pickens previously prosecuted Mata and Mata's family members and investigated Mata for another murder |
| 1075-1081 (ethics advisory opinions for lawyers) | Address circumstances like those allegedly present here |
| 1082-1085 (records from cases where Straetker or his office represented Mata); 1180 (Mata's declaration); 1205, 1206 (court records from day of Mata's arraignment) | Relevant to Mata's claim that Straetker advised him to accept representation by the NCPA |
| 1086-1106 (NCPA annual reports); 1107 (webpage listing commissioners and staff); 1108-1122, 1161 (rules and regulations); 1123-1125 (NCPA policy and procedure manuals); 1126-1135, 1140-1156 (NCPA agendas and minutes); 1159, 1160, 1204 (standards); 1162 (statutes); 1163 (news coverage) | Explain the NCPA and the types of actions Straetker would have taken as an NCPA commissioner |

| Exhibit Numbers and Contents | Purported Relevancy |
|---|---|
| 1167 (email chain involving Pickens and Straetker) | Shows that the NCPA was a resource for Straetker |
| 1168, 1174, 1187-1203 (materials related to Mowbray's work on case) | Show Mowbray's involvement in Mata's case |
| 1168, 1169 (NCPA's costs in defending Mata); 1185, 1186 (Scotts Bluff County budgets and audits) | Show the financial benefits to the county of the NCPA's representation of Mata |

[5-7] We agree with the State that any error in excluding Mata's exhibits was harmless because the evidence was cumulative. The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[14] Specifically, the erroneous exclusion of evidence does not require reversal if the evidence would have been cumulative and other relevant evidence, properly admitted, supports the trial court's finding.[15] Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.[16] In this case, even without the exhibits noted above, there was other properly admitted evidence that supported the district court's conclusion that Straetker had no conflict, as explained below. That conclusion is dispositive of Mata's claim that Pickens, too, had conflicts, as also explained below.

Mata attempts to avoid this conclusion by arguing that the State "effectively conceded" that most of "the exclusions were in error" by giving only "'illustrative'" examples of

---

[14] *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

[15] *Id*.

[16] *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

how the excluded exhibits were cumulative and not "specifically address[ing] the other excluded exhibits."[17] Moreover, Mata argues that even when the State did address specific exhibits by way of illustration, it "failed to do so with sufficient particularity,"[18] apparently because it did not "articulate which specific facts [were] cumulative."[19] However, Mata bases those arguments on opinions of this and other courts that have no application here[20]—and that would not preclude us from affirming the trial court's order on the ground that the evidence was cumulative even if the State had waived the argument.

Mata's apparent argument that evidence cannot be cumulative if it includes any fact not contained in the admitted evidence is equally unavailing. In arguing that there is no merit to the State's claim that the excluded evidence of Mowbray's involvement in Mata's case was cumulative, Mata points to an excluded exhibit he claims showed Mowbray "spent at least 81.75 hours working on Mata's case."[21] Mata seems to suggest that this exhibit was improperly excluded insofar as this fact

---

[17] Reply brief for appellant at 16.

[18] *Id*. at 17.

[19] *Id*. at 19.

[20] See, *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023) (to be considered by appellate court, party asserting alleged error must both specifically assign and specifically argue error in party's initial brief of error); *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023) (same); *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015) (same). See, also, *U.S. v. Aldridge*, 561 F.3d 759 (8th Cir. 2009) (similar); *Gilbert v. Des Moines Area Community College*, 495 F.3d 906 (8th Cir. 2007) (appellate court limiting its review to specific arguments that appellant raised before trial court); *White v. McDonnell Douglas Corp.*, 904 F.2d 456 (8th Cir. 1990) (on motion for summary judgment, trial court is not required to speculate on which portion of record nonmoving party relies).

[21] Reply brief for appellant at 19.

was not in the admitted evidence. We disagree. Mata's example is inapposite because the admitted evidence actually included Mowbray's testimony that he "logged" 81.75 hours "for reimbursement purposes" in Mata's case. However, even if the admitted evidence had failed to show the specific number of hours Mowbray "logged," the excluded exhibit would still be cumulative insofar as Mata offered it to show that Mowbray— someone he claims was "directly supervised"[22] by Straetker— was extensively involved in the case.[23]

[8] We similarly reject Mata's claim that in arguing that the evidence was cumulative, the State proves the evidence was relevant and, as such, should have been admitted. Under the standard of review noted above, in determining whether the erroneous exclusion of evidence requires reversal, we look not only to whether the evidence was cumulative, but also to whether other relevant evidence, properly admitted, supports the trial court's finding.[24] However, we also note that Neb. Rev. Stat. § 27-403 (Reissue 2016) allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[25] Here, for example, the presentation of all of the NCPA's annual reports, even for years when Straetker was not a commissioner, appears to be needless, given the extensive testimony

---

[22] Brief for appellant at 52.

[23] See, e.g., *State v. Allen*, 252 Neb. 187, 203, 560 N.W.2d 829, 841 (1997) (exhibits that incorporated "same substantive themes" as another exhibit and "tend[ed] to prove the same point" were cumulative evidence), *disapproved on other grounds, State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999). See, also, *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025) (similar).

[24] See *Jaeger, supra* note 14.

[25] *State v. Wilson*, 320 Neb. 728, 30 N.W.3d 165 (2026).

about the NCPA and the "types of actions" Straetker would have taken as an NCPA commissioner.[26]

Previously, in *State v. Boppre*,[27] we "expressly disapprove[d]" of the practice of submitting particularly lengthy motions (in fact, the district court noted *Boppre* in connection with Mata's 282-page successive motion for postconviction relief). We take this opportunity to expand on *Boppre* by expressly disapproving of offering particularly large numbers of cumulative exhibits.

Finally, having declined to disturb the district court's relevancy ruling, we must address Mata's argument that we could nonetheless take judicial notice of the exhibits containing our prior opinions and other court filings. Neb. Rev. Stat. § 27-201 (Reissue 2016) authorizes courts to take judicial notice of adjudicative facts.[28] However, even assuming a motion for judicial notice can be made in a brief, as Mata purports to do, we decline to take judicial notice of the exhibits in question because we can resolve the case without doing so.[29] Also, insofar as Mata apparently argues that the court filings "demonstrate ineffective assistance of postconviction counsel,"[30] the U.S. Supreme Court in *Martinez v. Ryan*[31] did not recognize a constitutional right to effective assistance of postconviction counsel. As such, there is no cognizable constitutional claim of ineffective assistance of postconviction counsel under Nebraska law.[32]

---

[26] Brief for appellant at 53.

[27] *State v. Boppre*, 315 Neb. 203, 227, 995 N.W.2d 28, 49 (2023).

[28] See, e.g., *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990) (fact is adjudicative if it affects determination of controverted issue in litigation).

[29] See, e.g., *State ex rel. Douglas Cty. Sch. Dist. No. 66 v. Ewing*, 319 Neb. 663, 24 N.W.3d 861 (2025).

[30] Reply brief for appellant at 20.

[31] *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012).

[32] See, e.g., *State v. Hessler*, 288 Neb. 670, 850 N.W.2d 777 (2014).

## 2. Mata's Case Was Properly Distinguished
### From *Williams* Because Straetker
### Had No Conflict of Interest

Mata also claims that the district court erred in concluding that he was not entitled to bring a successive motion for post-conviction relief under *Williams*.[33] In *Williams*, the defendant was represented by the same counsel for both his direct appeal and his first postconviction proceeding. Under those circumstances, we concluded that the defendant was entitled to raise claims of ineffective assistance of appellate counsel in a second postconviction motion, because the defendant's initial postconviction counsel could not be expected to raise his own ineffectiveness.[34] Specifically, we reasoned that "requir[ing] counsel to raise his or her own ineffectiveness, . . . 'would create the potential for a conflict of interest.'"[35]

Unlike the defendant in *Williams*, Mata had different counsel for his direct appeal and for his first postconviction proceeding. Nonetheless, Mata maintains that his case is like *Williams* because Straetker had four separate conflicts of interest that, individually and collectively, kept him from raising claims regarding the effectiveness and conflicts of Mata's trial and appellate counsel. Mata argues that the district court failed to address or recognize Straetker's conflicts and, thus, incorrectly concluded that Mata's case was distinguishable from *Williams*. The State counters that Mata's reliance on *Williams* is misplaced because Straetker had no conflict of interest.

### (a) Sixth Amendment Right to
### Conflict-Free Counsel

[9-12] The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to effective

---

[33] *Williams, supra* note 1.

[34] *Id*.

[35] *Id*. at 589, 889 N.W.2d at 113.

assistance of counsel.[36] The right to effective assistance of counsel entitles the accused to the undivided loyalty of an attorney, free from any conflict of interest.[37] A conflict of interest exists when a defense attorney is placed in a situation inherently conducive to divided loyalties.[38] The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard of another, where a lawyer's representation of one client is rendered less effective by reason of his or her representation of another client, or where it becomes a lawyer's duty on behalf of one client to contend for that which the lawyer's duty to another client would require him or her to oppose.[39]

[13-15] To establish a violation of the Sixth Amendment, a defendant who raises no objection at trial (and Mata does not allege that he raised any such objection) must demonstrate that his or her lawyer actively represented conflicting interests and that the actual conflict of interest adversely affected the lawyer's performance.[40] While a defendant who shows that a conflict of interest actually affected the adequacy of his or her representation need not demonstrate prejudice, such conflict of interest must be shown to have resulted in counsel's conduct detrimental to the defense.[41] An asserted conflict of interest must be actual, rather than speculative or hypothetical, before a conviction can be overturned on the ground of ineffective assistance of counsel.[42]

In this case, for the reasons set forth below, we agree with the State that Mata failed to show that Straetker had an actual

---

[36] *State v. Hudson*, 270 Neb. 752, 708 N.W.2d 602 (2005).

[37] *State v. Narcisse*, 260 Neb. 55, 615 N.W.2d 110 (2000).

[38] *State v. Marchese*, 245 Neb. 975, 515 N.W.2d 670 (1994).

[39] *Id*.

[40] See *id*.

[41] *Id*.

[42] *Id*.

conflict of interest due to (1) his service as an NCPA commissioner, (2) his incentives as a public defender, (3) his alleged advice that Mata accept representation by the NCPA, or (4) his representation of Gomez' grandfather. As such, we need not address Mata's arguments about how Straetker's performance was allegedly adversely affected.[43]

(b) Straetker's Service as NCPA Commissioner

Mata argues that the district court erred in failing to recognize that Straetker had a conflict of interest based on his service as an NCPA commissioner. Mata takes issue with specific aspects of the district court's order, as noted below. However, Mata primarily points to evidence he claims shows that as a commissioner, Straetker was part of the "same organization"[44] as the NCPA attorneys for purposes of Neb. Ct. R. of Prof. Cond. § 3-501.10 and effectively served as a managing partner of that organization. Mata argues that in representing him on postconviction, Straetker would have had to raise his own effectiveness and that of his coworkers—something that has been recognized to create the "'potential for a conflict of interest.'"[45] Mata also argues that Straetker's "loyalty" to the NCPA and his "relationships" with NCPA attorneys "constituted a 'personal interest' that hindered his

---

[43] See, e.g., *Porter v. Singletary*, 14 F.3d 554 (11th Cir. 1994) (declining to address whether counsel's performance was adversely affected when there was no proof of conflict).

[44] Brief for appellant at 49.

[45] *Williams, supra* note 1, 295 Neb. at 589, 889 N.W.2d at 113. See *State v. Payne*, 289 Neb. 467, 855 N.W.2d 783 (2014). See, also, *Christeson v. Roper*, 574 U.S. 373, 135 S. Ct. 891, 190 L. Ed. 2d 763 (2015); *Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004), *abrogated on other grounds, Cullen v. Pinholster,* 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (abrogation recognized by *United States v. Freeman*, No. 24-5019, 2025 WL 1179147 (10th Cir. Apr. 23, 2025)); *Koste v. Dormire*, 345 F.3d 974 (8th Cir. 2003); *Burns v. Gammon*, 173 F.3d 1089 (8th Cir. 1999); *United States v. Rossbach*, 701 F.2d 713 (8th Cir. 1983); *United States v. Kitchin*, 592 F.2d 900 (5th Cir. 1979).

ability to investigate and litigate" the errors of Mata's trial and appellate counsel,[46] in violation of Neb. Ct. R. of Prof. Cond. § 3-501.7(a)(2) (rev. 2019). We see no merit to those arguments.

The NCPA is essentially a legal services agency, and it has long been recognized that the relationship of board members and staff attorneys within such organizations "differs in important respects" from that between attorneys *within* a law firm or legal services agency.[47] As such, it has generally been recognized that so long as the board "limit[s] itself to establishing broad policies governing the operation of the program,"[48] attorney members of the board and staff attorneys may represent clients with adverse interests.[49] It is when the board has an "opportunity for shared knowledge of a client's affairs,"[50] or "interfere[s] or in any manner attempt[s] to influence a staff attorney or his [or her] independent judgement in the handling of the case,"[51] that conflicts can arise. Although Mata does not expressly rely on the authorities cited here, he claims that the commissioners shared in the staff attorney's knowledge and "exert[ed] considerable control" over

---

[46] Brief for appellant at 48.

[47] *Estep v. Johnson*, 383 F. Supp. 1323, 1325 (D. Conn. 1974).

[48] Neb. Ethics Adv. Op. for Lawyers No. 80-8 (1980). See, also, *Estep, supra* note 47, 383 F. Supp. at 1326 (board's responsibility for "broad policy formulation poses no general threat to the staff attorney's independence"); ABA Comm. on Ethics & Prof. Responsibility, Formal Op. 324 (1970) (similar).

[49] See, e.g., *E.E.O.C. v. Luby's, Inc.*, 347 F. Supp. 2d 743 (D. Ariz. 2004); Neb. Ethics Adv. Op. for Lawyers No. 11-04 (2011); Neb. Ethics Adv. Op. for Lawyers No. 80-8, *supra* note 48; Neb. Ethics Adv. Op. for Lawyers No. 79-8 (1979).

[50] *Estep, supra* note 47, 383 F. Supp. at 1325. See, also, *Luby's, Inc., supra* note 49; *Allen v. Academic Games Leagues of America, Inc.*, 831 F. Supp. 785 (C.D. Cal. 1993); *Berry v. Saline Memorial Hosp.*, 322 Ark. 182, 907 S.W.2d 736 (1995); *William H. Raley Co. v. Superior Court*, 149 Cal. App. 3d 1042, 197 Cal. Rptr. 232 (1983).

[51] Neb. Ethics Adv. Op. for Lawyers No. 80-8, *supra* note 48.

the NCPA and its attorneys.[52] However, even if the situation here were seen to be tantamount to a board member and a staff attorney representing clients with conflicting interests, the evidence does not support Mata's claims about the commissioners' knowledge or their control over the staff attorneys' handling of individual cases.

Mata asserts that the NCPA commissioners were "privy to information about [his] case."[53] However, the evidence shows the commissioners' knowledge was limited to matters of "public record." The commissioners knew "the client, the charges, the procedural posture of a case, whether a case was going to trial, and specific rulings in the case."[54] However, they were not aware of any "confidences" or "details," and they did not know the case strategy or litigation plan. Moreover, the meetings at which Mata claims his and other cases were discussed were "public" or "open" meetings that anyone could attend. Insofar as Mata complains of a conflict of interest, and not a breach of confidentiality,[55] we reject the suggestion that Straetker could have received information about Mata's case to which other people were not privy at a public meeting. There was evidence of informal discussions with the commissioners outside the public meetings. However, as explained above, there was nothing to suggest the information shared in those discussions included nonpublic information.

There is a similar lack of evidentiary support for Mata's claim that the commissioners could control the staff attorneys' judgment in handling individual cases. Mata claims that the commissioners "directly and indirectly supervised" the staff attorneys,[56] "implemented personnel policy,"[57] "navigat[ed]"

---

[52] Brief for appellant at 43.

[53] *Id*. at 41.

[54] *Id*. at 45-46.

[55] See Neb. Ct. R. of Prof. Cond. § 3-501.6(a) (rev. 2019).

[56] Brief for appellant at 49.

[57] Reply brief for appellant at 13.

grievances and personnel issues,[58] addressed issues with attorney representation, and maintained the NCPA's reputation, among other things. In so arguing, Mata overstates the evidence in the record. For example, Mata's claim that the commissioners supervised the attorneys is based in part on evidence showing that the commissioners hired the chief counsel, evaluated his or her performance, and had oversight over him or her.[59] But "report[ing]" and "oversight" do not constitute direct supervision as that term is conventionally understood.[60] There were similar issues with the evidence underlying Mata's other claims here, as the table below illustrates, and the evidence otherwise shows that the commissioners had no involvement in the individual decisions that were made in the representation of any client.

| Mata's Claim | Evidence at Trial |
| --- | --- |
| Commissioners were seen as bosses by the NCPA staff | Staff attorneys called Lindemeier the "boss" when they saw him at events to "give [him] a hard time" |
| Commissioners policed the office and made sure things got done correctly | Lindemeier made this statement in response to a question about whether staff could report issues with the chief counsel to the commissioners; otherwise, the evidence showed the chief counsel "administered" and "managed" the office |

---

[58] Brief for appellant at 44.

[59] Cf. Neb. Rev. Stat. § 29-3928 (Cum. Supp. 2024) (chief counsel appointed by commissioners and serve at their pleasure with salary set by them).

[60] See, e.g., *Allstate Ins. Co. v. Hegar*, 484 S.W.3d 611 (Tex. App. 2016) ("direct supervision" involves supervisor's being physically present and personally directing performance of directed acts).

| Mata's Claim | Evidence at Trial |
|---|---|
| Commissioners could direct the activities of the NCPA staff through the chief counsel | Mowbray understood a commissioner's comments about defense attorneys' being misquoted in the press to mean he should talk to Soucie about his comments to the press and did so |
| Commissioners interacted with the NCPA staff and could convene them for meetings | Staff rarely attended commission meetings; but one time, at a commissioner's request, the commissioners had lunch with the staff to get to know them |
| Commissioners could award performance-based pay to NCPA staff | Lindemeier said Mowbray occasionally brought requests for bonus pay to the commissioners and they usually deferred to him; Mowbray said the commissioners considered his requests, but he made the final decision; attorney performance was discussed in connection with requests for bonus pay, but the only examples of this concerned the amount of work |

| Mata's Claim | Evidence at Trial |
|---|---|
| Commissioners implemented personnel policy and played a crucial role in navigating grievances or personnel issues between the chief counsel and NCPA staff; the chief counsel discussed personnel problems and discipline issues with them | Lindemeier and Mowbray gave somewhat different testimony as to whether the chief counsel discussed performance problems and discipline issues with the commissioners; however, there was no evidence the discussions involved confidential information about specific cases; general information about staff turnover and activities was shared for awareness, and not for board action |
| Commissioners were responsible for addressing issues with attorney representation, ensuring the NCPA provided effective representation, and maintaining the NCPA's reputation | There was evidence the commissioners advocated for the NCPA with judges, legislators, and county commissioners and they sometimes heard from judges about staff attorneys' performance, but only comments noted concerned matters of public record, like the number and length of motions and the tasks they completed |

| Mata's Claim | Evidence at Trial |
|---|---|
| Commissioners referred to specific cases when explaining why they believed clients were receiving effective assistance when evaluating the chief counsel's performance | When referring to specific cases, the commissioners focused on matters of public record, such as the fact that a charge was dismissed or the death penalty was avoided |
| Commissioners evaluated attorneys' work product | Commissioners discussed attorney performance, as described above, but there was no evidence they reviewed materials prepared by or for attorneys to assist in prosecution or defense of pending suits or in reasonable anticipation of litigation |

Similarly, we see no merit to Mata's argument that Straetker had a personal interest conflict due to his "loyalty" to the NCPA, his "relationships" with NCPA attorneys, and other alleged interests of this nature.[61] We have historically viewed personal interest conflicts as "arguably the least consequential type of conflict," because "'when the attorney has a personal conflict, the attorney can still fulfill his or her duty of loyalty to a client, although doing so may be to the detriment of the attorney's personal interest.'"[62] And the record in this case does not support a finding that Straetker's purported personal interests "would have tempted him" to act against

---

[61] See brief for appellant at 48. See, also, Neb. Ct. R. of Prof. Cond. § 3-501.7(a)(2) (rev. 2019).

[62] *State v. Malone*, 308 Neb. 929, 948, 957 N.W.2d 892, 912 (2021), *modified on denial of rehearing* 309 Neb. 399, 959 N.W.2d 818.

Mata's interests.[63] There was evidence Straetker "enjoyed" his service on the NCPA. However, he never described feeling loyalty to the NCPA. It was Lindemeier, who served far longer as a commissioner than Straetker did, who testified to that effect. There was similarly no evidence Straetker had a particularly close relationship with any NCPA attorney. There was merely testimony that commissioners got to know the NCPA attorneys, assuming that they did not already know them from other contexts. We have previously declined to find a conflict of interest under similar circumstances.[64]

Mata also seems to suggest that Straetker had a personal interest conflict because Mowbray "recruited" him and "advocated" for his appointment as a commissioner.[65] However, the evidence shows only that, consistent with his usual practice, Mowbray contacted Straetker to see if he would be willing to fill a vacancy on the commission and then forwarded his name to the Governor for consideration.

Mata's remaining arguments as to why the district court was mistaken in not finding a conflict of interest based on Straetker's service as a commissioner are equally unavailing. Mata takes issue with the district court's reading of *Williams* and its statement that (1) there was "little if any temporal connection" between Straetker's service as a commissioner and

---

[63] See, e.g., *State v. Edwards*, 294 Neb. 1, 22, 880 N.W.2d 642, 655 (2016).

[64] See, e.g., *Malone, supra* note 62 (finding that purported family relationship between defendant's attorney and victim did not amount to actual conflict of interest where attorney was, at best, distant relative of victim, and there was nothing in record to suggest attorney felt any loyalty to victim or victim's immediate family); *Edwards, supra* note 63 (despite defendant's claim that his counsel was friend of material prosecution witness, evidence showed relationship was strictly professional, and counsel and witness never went out to dinner or drinks or engaged in any kind of activity typically done with friends); *State v. Jackson*, 275 Neb. 434, 747 N.W.2d 418 (2008) (no evidence to show trial counsel had personal relationship with appellate counsel).

[65] Reply brief for appellant at 20.

his representation of Mata on postconviction, (2) Straetker was attentive to conflicts, and (3) Straetker raised claims of ineffective assistance of trial counsel on Mata's behalf.[66] However, even if we were to agree the district court was mistaken in one or more of those regards, it would not change our view that the district court did not err in concluding that Mata failed to show Straetker had a conflict due to his service as an NCPA commissioner.

### (c) NCPA Resources

Mata also argues that the district court erred by failing to find that Straetker had a conflict based on his "incentives" as a public defender to remain on good terms with the NCPA.[67] Mata points to evidence he claims shows that the financial and other benefits of the NCPA's taking cases in Scotts Bluff County were such that there was a conflict between "[Straetker's] duty to argue NCPA attorneys ineffectively represented Mata"[68] and his "responsibility to . . . Scotts Bluff County [public defender] clients who benefited from NCPA's resources,"[69] in violation of § 3-501.7(a)(2). The State disagrees that Straetker was "disincentivized to criticize [the NCPA] attorneys."[70] As such, the State claims there was no conflict.

Mata's argument here is based in part on evidence regarding the impetus behind the creation of the NCPA, the services it provides, the financial and other benefits of its taking a case, its discretion in accepting cases, and Straetker's use of NCPA resources to obtain sample briefs and identify experts that, were it seen to create a conflict of interest on Straetker's part, would also seem to create a conflict of interest on the part of every public defender and criminal defense counsel in

---

[66] See *Williams, supra* note 1.

[67] Brief for appellant at 59.

[68] *Id*. at 57.

[69] *Id*. at 57-58.

[70] Brief for appellee at 22.

the State. Mata cites no authority to support such a view, and we decline to find a conflict on that basis.

As to the other evidence upon which Mata relies, it is less conclusive than he suggests. Mata points to evidence he claims shows that Straetker never objected to the NCPA's taking a case; that Straetker had to submit a proposed budget every year to the county commissioners, "who at times[] directed [him] to make cuts"[71]; and that attorneys can "have 'hard feelings' when facing allegations of ineffective assistance."[72] However, there was also evidence that Straetker declined to have the NCPA take certain cases and instead had his office handle them; that "most of the time" the county commissioners would "just approve" his proposed budget; that the commissioners supported him in hiring another attorney; that he never informed staff that "they needed to limit the number of trainings that they attended" due to budget constraints; and that the only time the county commissioners requested he make some budget cuts was in his "last year" as public defender—which, depending upon what Straetker meant by that phrase, could have been after he filed Mata's second amended motion for postconviction relief.

There was also evidence that the NCPA attorneys had had friends raise claims of ineffective assistance against them, that they were not "offended" by such claims, and that their practice of providing briefs and other assistance to criminal defense counsel would not have been "change[d]" by claims of ineffective assistance raised against them. In fact, the NCPA's "major case resource center" is required by statute to be available, subject to the caseload standards of the commission, "to assist public defenders, contracting attorneys, or court-appointed attorneys with the defense of a felony offense."[73] There are similar statutory requirements as to the provision of

---

[71] Brief for appellant at 57.

[72] *Id*.

[73] Neb. Rev. Stat. § 29-3930(5) (Cum. Supp. 2024).

other assistance by the commission,[74] although it is generally not required to take specific cases,[75] as Mata argues.

The district court heard all this evidence and did not conclude that Straetker had a conflict of interest based on his purported incentives as a public defender to remain on good terms with the NCPA. Under the standard of review set forth above, we give deference to that conclusion, and we see no error here.

### (d) Alleged Advice to Accept
### Representation by NCPA

Mata similarly argues that the district court erred in failing to find that Straetker had a conflict based on his alleged advice that Mata accept representation by the NCPA. Mata claims that Straetker "personally vouched for the quality of representation [he] would receive."[76] Mata argues that Straetker could not challenge the quality of the NCPA's representation without acknowledging his own "ineffective advice" that Mata should accept representation by the NCPA.[77] The State counters that "Straetker's advice to Mata would not itself have been ineffective assistance, so Straetker was not being forced to acknowledge his own ineffectiveness to raise those claims."[78]

Mata is correct that courts have opined that "'[a]dvice as well as advocacy is permeated by counsel's self-interest, and no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely

---

[74] § 29-3930(1) through (4).

[75] But see Neb. Rev. Stat. § 29-4122 (Reissue 2016) (under DNA Testing Act, NCPA shall be appointed to represent indigent defendant unless chief counsel declines appointment due to conflict of interest or because case would exceed caseload standards set by commission).

[76] Brief for appellant at 60.

[77] Id.

[78] Brief for appellee at 22.

by a desire for self-preservation.'"[79] However, we see nothing in the record to support Mata's assertion that Straetker's purported advice implicated his self-interest. As noted above, Mata claims Straetker "personally vouched for the quality" of the representation Mata would receive from the NCPA.[80] But even if Mata's deposition had been admitted into evidence, it would have shown only that Mata claimed Straetker told him the NCPA "had really good lawyers or . . . would do a really good job" and "would have more resources available to defend [him]," and he relied on Straetker's advice in agreeing to accept NCPA representation. We are not persuaded that those comments amount to personally vouching for the quality of the NCPA's representation.

We also note that there was evidence calling into question whether the conversation described by Mata occurred. Straetker did not dispute that he was "probably" in the courthouse on the day of Mata's arraignment and that he or someone else from the public defender's office "possibl[y]" talked to Mata. Nor did he dispute Mata's account of the alleged conversation. However, Straetker said he had no recollection of this conversation and indicated that he was unlikely to have made such a statement for various reasons, as discussed earlier in this opinion.

Mata relies primarily upon *Christeson v. Roper*[81] in arguing that Straetker had a conflict based on his purported advice to Mata. In *Christeson*, the defendant's counsel failed to meet with him until more than 6 weeks after his federal habeas petition was due and finally filed the petition 117 days late. Tolling of the relevant statute of limitations was available for "'serious instances of attorney misconduct.'"[82] However, the

---

[79] Brief for appellant at 60 (quoting *U.S. v. Fulton*, 5 F.3d 605 (2d Cir. 1993)).

[80] Brief for appellant at 60.

[81] *Christeson, supra* note 45.

[82] *Id*., 574 U.S. at 378.

U.S. Supreme Court reasoned that advancing such a claim would have required the attorneys to "denigrate their own performance."[83] The circumstances here, however, fall far short of those in *Christeson*, even assuming Mata did accept representation by the NCPA based on Straetker's statement that the NCPA attorneys were "good lawyers" or would do a "good job" and had "more resources available to defend [him]."

(e) Prior Representation of Gomez' Grandfather

Finally, Mata argues that the district court erred in failing to find that Straetker had a conflict based on his prior representation of Gomez' grandfather. Mata claims that as a result of this representation, Straetker owed Gomez' grandfather a "duty of continued loyalty" that was incompatible with his representation of Mata, and he did not secure Mata's waiver of the conflict.[84] The State concedes Straetker owed Gomez' grandfather a duty of loyalty, but argues that this duty did not preclude his representing Mata. The State also argues that there is nothing in the record showing Straetker "maintained a relationship with his former client that would have affected his ability to represent Mata."[85] We see no error by the district court here.

In arguing otherwise, Mata relies on Neb. Ct. R. Prof. Cond. § 3-501.9 and *Jennings v. Purkett*.[86] Section 3-501.9 does not preclude a lawyer from representing a person whose interests are adverse to those of a former client in every case. Rather, it prohibits a lawyer, who formerly represented a client in a matter, from thereafter representing another person "in the same or a substantially related matter in which that person's interests are materially adverse" to the former client's interests,

---

[83] *Id.*

[84] Brief for appellant at 62.

[85] Brief for appellee at 23.

[86] *Jennings v. Purkett*, 7 F.3d 779 (8th Cir. 1993).

absent the former client's informed consent, confirmed in writing.[87] Section 3-501.9 also prohibits a lawyer from using information related to the representation of the former client to the former client's disadvantage or revealing information related to the representation, except as provided in the rule.[88] There is nothing to suggest this matter is the same as or substantially related to the matter in which Straetker represented Gomez' grandfather,[89] or that Straetker used information related to his representation of Gomez' grandfather to the grandfather's disadvantage or revealed information related to that representation.

Mata's reliance on language in *Jennings* regarding conflicts based on a defense attorney's "'ties with the [] victim's family'" is similarly misplaced.[90] In *Jennings*, a federal court of appeals concluded that the defendant might be able to show the prejudice required to excuse a procedural default if the conflict of interest he alleged on the part of his trial counsel were proved.[91] The alleged conflict in *Jennings* involved a situation where the defendant's attorney had sold real estate to the victim's mother; the deed to the property may have required the victim's mother to make payments to the attorney while he represented the defendant; the attorney suggested the defendant's mother talk with the victim's mother because she was "'a good woman and I know her very well'"[92]; and the attorney discussed the case with the victim's mother prior to

---

[87] § 3-501.9(a).

[88] § 3-501.9(c).

[89] See, e.g., § 3-501.9, comment 3 ("[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter").

[90] Brief for appellant at 62 (quoting *Jennings, supra* note 86).

[91] *Jennings, supra* note 86.

[92] *Jennings, supra* note 86, 7 F.3d at 780.

the defendant's plea, purportedly to evaluate the strength of the State's case. During one of those discussions, the victim's mother told the attorney she believed the defendant raped her daughter. The attorney said he was "'a little bit afraid that [the victim's mother] might have held [his representation of the defendant] against [him] a little bit from the standpoint that she was thinking about the property there.'"[93]

Here, in contrast, there was no evidence of any ties between Straetker and Gomez' family beyond Straetker's representation of Gomez' grandfather on a matter that is not alleged to be related to the present matter. The previous matter occurred 9 years before Mata filed the pro se motion for postconviction relief in connection with which the Scotts Bluff County public defender's office was subsequently appointed to represent him. Unlike in *Jennings*, there was no evidence that Straetker had any business dealings or other relationship with Gomez' grandfather while he represented Mata, that he discussed the case with Gomez' grandfather or heard the grandfather's views regarding Mata's guilt, or that he was concerned that Gomez' grandfather might hold his representation of Mata against him.

That Gomez' father is a statutorily defined "victim" for purposes of Neb. Rev. Stat. § 81-1848(1) (Reissue 2024) does not change our conclusion here.[94]

### 3. CLAIM REGARDING PICKENS' ALLEGED CONFLICTS IS PROCEDURALLY BARRED

[16] Mata claims the district court erred in failing to recognize that Pickens had a conflict of interest based on his representation of Gomez' grandfather and in finding that Mata waived Pickens' other conflicts. The district court granted an evidentiary hearing on Pickens' purported conflicts and reached a conclusion based, at least in part, on its view of

---

[93] *Id*.

[94] See Neb. Rev. Stat. § 29-119 (Supp. 2025).

the merits of that claim. We, however, affirm the order of the district court because we find Mata's claim regarding Pickens' conflicts to be procedurally barred for the reasons set forth below. An appellate court has the discretion to affirm, as it deems appropriate, a correct result that was reached below for the wrong reason.[95]

### 4. Mata's Other Claims Are Also Procedurally Barred or Not Cognizable

Finally, Mata argues that the district court erred in dismissing his successive motion for postconviction relief on procedural grounds and in not granting him any further evidentiary hearing on the merits of his claims. We disagree. Our conclusion that Mata failed to prove his postconviction counsel had conflicts of interest that prevented counsel from raising Mata's claims regarding his representation by the NCPA is dispositive of all Mata's claims except his claim that he received ineffective assistance of counsel from Straetker in conjunction with his initial motion for postconviction relief.

[17,18] The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.[96] The effect of Neb. Rev. Stat. § 29-3001(3) (Cum. Supp. 2024) is to require that all available grounds for postconviction relief must be stated in the initial postconviction motion and, once that motion has been judicially determined, any subsequent postconviction motion regarding the same conviction and sentence may be dismissed by the district court unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of filing the prior motion.[97]

In this case, Mata could have raised all his claims, except his claim of ineffective assistance of postconviction counsel,

---

[95] *Sebade v. Sebade*, 320 Neb. 398, 28 N.W.3d 19 (2025).

[96] *State v. Galindo*, 315 Neb. 1, 994 N.W.2d 562 (2023).

[97] *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022).

on direct appeal or in his initial motion for postconviction relief. Therefore, those claims are procedurally barred.

Mata's constitutional claim of ineffective assistance of postconviction counsel is not cognizable, as explained above.[98]

## VI. CONCLUSION

Mata was not entitled to bring a successive motion for postconviction relief under *Williams*, and his other arguments are without merit. As such, we affirm the order of the district court.

Affirmed.

Freudenberg and Bergevin, JJ., not participating.

---

[98] See *Hessler, supra* note 32.